[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON POST-VERDICTS MOTIONS
On June 28, 1995 the jury returned verdicts against "the Defendants, City of New Haven and Pat Rubano", and "the Defendants, City of New Haven and Michael Barker". Damages were awarded in both verdicts as follows:
a. economic damages $ 208,000
b. non-economic damages $ 500,000 CT Page 8794 ---------- Total damages $ 708,000
The jury found no negligence on the part of the plaintiff. Both were general verdicts. There were no interrogatories to the jury.
Both verdicts were accepted and ordered recorded that day.
The Connecticut Law Journal of June 27, 1995, page 10, published a "Notice to Members of the Bar Re: New Haven Judicial District Court Schedules during the week of the Special Olympics World Games, July 3, 5, 6 and 7, 1995." That official publication stated in part:
 "All courthouses, . . . and all Judicial Branch Offices located in the City of New Haven, will close at 3:00 P.M. on July 3, 1995."
The State of Connecticut, Judicial Directory dated and published September 1994, lists Tuesday, July 4, 1995, Independence Day, as a holiday (§ 1-4, General Statutes). The Clerk's office was legally closed from 3:00 P.M. July 3, 1995 until 9:00 A.M. on July 5, 1995.
"The five days allowed to file motions to set side a verdict and motions for new trials . . . must be filed with the Clerk within five days after the verdict is accepted or judgment rendered, exclusive of such days as the Clerk's office is not open; provided that for good cause the court may extend this time." P.B. § 320.
The following motions are stamped "Filed — July 5, 1995 Judicial District of New Haven, Superior Court, Chief Clerk's Office."
Motion For Remittitur (#124)
Motion to Set Aside Verdict and For New Trial (#125)
Motion for Evidentiary Hearing (#126)
Motion for Judgment Notwithstanding Verdict (#127)
On July 10, 1995 plaintiff filed objections to the above four motions (see #128, #129, #130 and #131).
On July 12, 1995 defendants filed responses to plaintiff's CT Page 8795 objections (#132, #133, #134 and #135).
On July 14, 1995 plaintiff filed a Memorandum of Law in support of her Objections to Motion to Set Aside Verdict, a Supplemental Objection to Defendants' Motion For Remittitur, and her Supplemental Objection to Defendants' Motion For Evidentiary Hearing.
The first bridge to cross concerns plaintiff's claim that defendants' above-enumerated four motions were not timely filed under the mandates of P.B. § 320, i.e., "within five days . . . exclusive of such days as the Clerk's office is not open."
There are two ways on which to predicate a decision on this issue under our rules of practice. First, the Clerk's office was open on July 3rd, from 9:00 A.M. until 3:00 P.M. Thus, the defendants are barred from pursuing these post-verdict motions. Second, the Clerk's office was "not open" from 3:00 P.M. until 5:00 P.M., thus the defendants have the benefit of P.B. § 405, i.e.:
 "If the last day for filing any matter in the Clerk's office falls on a day on which such office is not open . . . or is closed pursuant to authorization . . . due to the existence of special circumstances, then the last day for filing shall be the next business day. . . ."
One might say that the glass is half empty. Another might say the glass is half full.
P.B. § 6 reads:
 "Rules To Be Liberally Interpreted. The design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice."
Justice Cotter in Sheehan v. Zoning Commissioner, 173 Conn. 408,412 (1977), stated:
 "Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be CT Page 8796 brought about with due regard to necessary rules of procedure."
Plaintiff claims that the Clerk's office was open on July 3 until 3:00 P.M. and defendants had notice thereof via the Law Journal and could have and should have filed the motions before 3:00 P.M.
The facts of this case and justice warrant a finding that defendants' four motions filed on July 5, 1995 met the mandates of P.B. § 405 and were timely filed under the June 27, 1995 publication in the Law Journal. It is manifest that a strict adherence to plaintiff's claim would work an injustice to the defendants and terminate proceedings on their post verdicts motions without a determination of the merits of the issues presented.
In sum, this court declines to interpret the law and facts of this case in so strict a manner as to deny the defendant the pursuit of their post-verdict motions. Andover v. Board of TaxReview, 232 Conn. 392, 400 (1995).
DECISION ON:
 (1) Motion to Set Aside Verdicts and For New Trial (#125)
 (2) Objection to Defendants' Motion To Set Aside Verdicts (#129)
 (3) Response to Plaintiff's Objection to Defendants' Motion to Set Aside Verdicts (7/12/95)
 (4) Memorandum of Law in Support of Plaintiff's Objections to Motion to Set Aside Verdicts (7/14/95)
 #125
 Paragraph 1
This claim is predicated on the court allowing plaintiff's photo of the area in general and the stairway as an exhibit
 "Such evidence is admissible if it will assist the jury in understanding the testimony and if the photograph or pictorial representation fairly represents what it purports to CT Page 8797 represent." Rhanshard v. Bridgeport, 190 Conn. 798, 806 (1983).
The basis of the photo was to show the jury the general area, not the "mat" alleged to be a substantial factor in plaintiff's fall. By the testimony of witnesses it was perfectly clear that the torn mat was torn, never photographed or retained as evidence.
Paragraph 2
This claim states a self-serving conclusion.
Paragraph 3
This claim is based upon the defendants' attempt to renege on their stipulation as to the admission of their own incident report that contained the investigation of the incident and statement of their own investigating employee.
After final arguments, the charge to the jury and while the attorneys were reviewing the inventory of exhibits to determine if any exhibit was altered, defendants objected to the investigation report because of a statement, viz, "the damaged tread was immediately replaced". Plaintiff objected to any alteration of the stipulation and the objection was sustained.
This was the defendants' own exhibit. It was dated March 12, 1994. There was ample evidence from the employee of defendant City of New Haven that the torn mat or tread involved was not retained or photographed. The statement in the post-accident investigation added no evidence not before the jury by way of testimony.
Paragraph 4
This claim again relies on the investigation report as a basis for setting aside the verdicts. Such basis is denied above, as hereinbefore stated.
Paragraph 5
This claim repeats the nub of the aforementioned claim. (Paragraphs 3 and 4).
Paragraph 6
CT Page 8798
This claim is disposed of by the U.S. Supreme Court decision in Tanner v. United States, as hereinafter stated.
Paragraph 7
This claim of quotient verdicts is inconsistent with all affidavits filed by interested attorneys or jurors, as on file. There is no substantial or wholly conclusive evidence of a quotient verdict. Tanner v. United States, as hereinafter stated.
Paragraph 8
This claim again states the issue of actual or constructive notice of the defect and a reasonable opportunity to remedy the claimed defect. This theory of error in not granting defendants' motion for directed verdicts overlooks basic law that governs the function of the jury to decide facts. There was evidence to the effect that on March 12, 1992 the mat that covered the tread on the stairway was defective in that it was torn and showed evidence of being torn before she fell. The jury well could have inferred from that fact the defendants had failed to make a reasonable inspection of the stairway. The jury might have concluded that the defendants had failed to use reasonable care to see that the stairway was reasonably safe for the use to which it was intended. The jury could reasonably have found that the defect in the mat was a substantial factor in producing the plaintiff's injury.
The investigating employee examined the mat or rubber tread after the accident and testified that it appeared torn, dirty and dusty. He agreed that he did not photograph or save it. He agreed that it "may have been torn before the accident." Another employee of the defendant testified that there was no regular inspection policy for the building. If a complaint was received it was corrected and a record kept of the complaint and correction. Plaintiff described the tread as worn smooth in the middle for two years and never replaced. The jury was entitled to find constructive notice to the defendant based on that testimony. She also testified she was not running, not taking medication or prescriptions, did not stumble, but that she tripped on the mat that was not preserved or photographed. The jury was entitled to disbelieve the testimony of defendants' employees.
By the same token, the jury failed to find that the plaintiff was contributorily negligent as alleged by defendants. There was evidence that she used the stairway over 800 times before she fell. CT Page 8799 The jury decided that issue of fact.
 "If the evidence presented is in conflict and more than one conclusion is reasonably open to the jury . . . and if the jury may reasonably draw different inferences from the evidence, or if the jury could be called to pass upon the credibility of witnesses or their testimony, a verdict should not be directed by the court." Gore v. Peoples Savings Bank, 35 Conn. App. 26, 137 (1994).
In this case, on the basis of the evidence presented, the jury reasonably could have arrived at more or different verdicts than the two returned. The evidence presented by the plaintiff, interpreted in the light most favorable to the plaintiff and every reasonable inference drawn in plaintiff's favor, supports the verdicts. Credibility of the witnesses presented questions for the jury alone.
Paragraph 9
This issue of contributory negligence is discussed above. The issue of credibility was for the jury. The conclusion of the jury cannot be ignored, reversed or modified.
Paragraph 10
This is speculation and ignores the test of credibility.
Paragraph 11
This is speculation and ignores the test of credibility. Plaintiff testified she was exercising due care and used the stairway several hundred times.
The Motion to Set Aside Verdicts and For New Trial (#125) is denied.
Objection to Defendants' Motion to Set Aside Verdicts (#129) is sustained.
DECISION ON:
 (1) Motion for Evidentiary Hearing (#126)
CT Page 8800
(2) Objection to Motion For Evidentiary Hearing (#128)
 (3) Response to Plaintiff's Objection to Defendants' Motion for Evidentiary Hearing (7/12/95), and
 (4) Supplemental Objection to Defendants' Motion For Evidentiary Hearing (7/15/95)
 #126
In Tanner v. United States, 483 U.S. 107, 117-120 (1986), the legal issues of juror testimony to impeach a jury verdict was reviewed:
 "The near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict. . . . Exceptions to the common-law rule were recognized only in situations in which an `extraneous influence' . . . was alleged to have affected the jury. . . . In situations that did not fall into this exception for external influence, however, the Court adhered to the common-law rule against admitting juror testimony to impeach a verdict."
 "Substantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict. As early as 1915 this Court explained the necessity of shielding jury deliberations from public scrutiny:
 `[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party CT Page 8801 in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation — to the destruction of all frankness and freedom of discussion and conference.' McDonald v. Pless, 238 U.S., at 267-268.
 See also Mattox v. United States, 146 U.S. 140
(1892).
 The Court's holdings requiring an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process. See Smith v. Phillips, 455 U.S. 209
(1982)."
There is no claim of external influence or improper outside influence, extraneous prejudice, information improperly brought to the jury's attention, or other matter which does not inhere in the verdicts themselves except defendants' claims that the jury verdicts were determined by aggregation and an average or by lot, or game, or chance, or other artifice or improper manner. SeeMcNamee v. Woodbury Congregation of Jehovah's Witnesses, 193 Conn. 15,19 (1984).
The claim of a "quotient verdict" has been aborted by the affidavits of the foreperson and another juror. Other claims of defendants as to issues of contributory negligence of plaintiff and the determination of fair, just, and reasonable damages by the jury are not supported by any substantial or wholly conclusive evidence as required in Tanner, above. In that factual situation the jury decided routine issues of fact and damages.
The Motion For Evidentiary Hearing is denied (#126).
The Objection to Motion For Evidentiary Hearing (#128) is sustained and the Supplemental Objection to Defendants' Motion for CT Page 8802 Evidentiary Hearing (7/15/95) is sustained.
DECISION ON:
 (1) Motion for Judgment Notwithstanding Verdict (#127)
 (2) Objections to Defendant's Motion For Judgment Notwithstanding Verdict (7/10/95)
 (3) Response to Plaintiff's Objection to Defendants' Motion for Judgment Notwithstanding Verdict
 #127
This motion again presents claims that have been decided hereinbefore, whereby the court has ruled the motions filed on July 5, 1995 were properly filed within the time frame prescribed by our rules of practice and that the jury decided the factual issue of "notice" as reflected in their verdicts.
The Motion For Judgment Notwithstanding Verdict (#127) is denied.
Objections to Defendants' Motion for Judgment Notwithstanding Verdict (7/10.95) are sustained.
DECISION ON:
 (1) Motion for Remittitur ((#124)
 (2) Objection to Motion For Remittitur (#130)
 (3) Response to Plaintiff's Objection to Defendants' Motion for Remittitur (7/12/95), and
 (4) Supplemental Objection to Defendants' Motion for Remittitur (7/14/95)
The defendants claim that the verdicts of $708,000 are excessive and that their size alone indicates that the jury was influenced by partiality, mistake or corruption and that the court must order remittitur.
 The court must "review the verdict in this case in the light of certain principles. CT Page 8803 First, the amount of an award is a matter peculiarly within the province of the trier of facts. (Citations omitted). Second, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. (Citations omitted) The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption."
Pisel v. Stamford Hospital, 180 Conn. 314, 342-343 (1980).
The above motion and objections address claims that the verdicts are excessive. In Barbieri v. Taylor, 37 Conn. Sup. 1
(1980), Judge Berdon addressed a claim that the verdict was inadequate as a matter of law and ordered an additur (§ 52-228b). In Barbieri, the motion was to set aside the verdict or in the alternative an additur.
The basic law on increasing a verdict or decreasing a verdict is the same. Barbieri states in part:
 "A serious constitutional issue can be raised by setting aside a verdict of the jury. In a case such as this, [l]itigants have a constitutional right to have issues of fact decided by the jury. (Citations omitted.) The right to a jury trial is fundamental in our judicial system, and this court has said that the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of a trial by jury includes the right to have issues of fact as to which there is room for reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. (Citations omitted.) Clearly then, the amount of damages is within the province of the jury. CT Page 8804 (Citation omitted.) To justify setting aside a verdict, something more than a doubt of its adequacy must exist. Therefore upon reviewing the adequacy of an award, the court must move cautiously to determine whether it should interfere with the verdict of a jury. However, it is the court's duty to set aside the verdict when it finds that `it does manifest injustice, and is . . . palpably against the evidence. . . .' (Citation omitted.) In a case such as this the test to be applied to determine if a verdict should be set aside, is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. (Citations omitted.) Of course [w]hether the court would have reached a different verdict is not in itself decisive." (Internal quotation marks omitted).
Barbieri, pp. 2 and 3.
Although the parties cite numerous cases in their fifteen or so documents on file addressing their post-verdicts motions, Judge Berdon's decision in Barbieri says it all, i.e., "to set aside a verdict (or add or subtract therefrom), the court must find that it does manifest injustice, and is palpably against the evidence."
The jury was instructed in accordance with the mandate of § 52-272h(a)(1) "Economic damages means compensation determined by the trier of fact for pecuniary loss including, but not limited to, the cost of reasonable and necessary care, rehabilitative services, custodial care and loss of earnings or earning capacity excluding any non-economic damages: (2) non-economic damages means compensation determined by the trier of fact for all non-pecuniary losses, including but not limited to, physical pain and suffering and mental and emotional suffering."
The jury was given proper instruction on credibility of parties and witnesses, comparative negligence and fair, just and reasonable damages. (No exceptions noted.) CT Page 8805
Her payments to health care providers approximated $57,300, computed as follows:
Yale New Haven Hospital $ 26,000
Yale Surgical 1,200
Ambulance 369
Physical Therapy 3,845
Alan M. Reznik, M.D. 8,575
Omni Home Health Service 15,840
 Medical supplies equipment 1,500 -------- $ 57,300
There was no evidence of any disability before her fall. She lost earnings for three years to the date of the trial, claiming a total of $58,500. She had an 11.7 year life expectancy and testified she intended to continue working as long as she was able. She claimed loss of earning capacity. Dr. Reznik, her treating orthopedic physician, estimated future medical expenses of $1,300 to remove a surgical pin, $6,500 to replace her knee, and $4,000 for physical therapy.
These calculations amount to about $127,600. When considered with an 11.7 year life expectancy and a claim for loss of earning capacity based on her past earnings, these verdicts do not shock the conscience of the court.
After October 1, 1986, Tort Reform I, the trier of fact was required to decide damages for past, economic and non-economic, and future economic and non-economic, damages, i.e., four findings of damages. The General Assembly mandated in Tort II, i.e., after October 1, 1987, that the jury decides only economic and noneconomic damages.
This statutory change demanded that the trier of fact weigh "all" the evidence before them regarding economic damages, not just "numbers". Dr. Reznik's opinion, based on a reasonable degree of medical probability, is that she will require further surgery to CT Page 8806 remove the plate in the tibia, that she will develop arthritis, and that she would become symptomatic enough to require a knee replacement. Additional testimony before the jury indicated his opinion:
 "In that instance, typically having a fracture previously, we would do it as a two stage procedure, remove the plate, take cultures to make sure there isn't any infection ensuing from the original surgery, allow the bone to heal with the plate removed and then subsequently doing the total knee replacement, . . . several months later, once the . . . wounds get to heal (requiring) a convalescent period (a non-weight bearing period) of at least six to eight weeks . . . when you would want to protect her . . . the bone under the plate will be transient or temporarily weakened when you remove the plate. The body needs time to accommodate that. If you start full weight bearing immediately after removing a plate, there's a chance you might fracture again . . . she's going to need a total knee replacement at some point in the remainder of her life expectancy as a result of these degenerative arthritic changes . . . directly related to this injury and this incident. . . . Absolutely . . . these injuries and the care attended to these injuries were all a direct result of the fall . . . on March 12th of 1992 — "Yes" . . . remove plate six weeks convalescent period . . . limited weight bearing . . . then total knee replacement . . . she was obese i.e. overweight . . . elderly . . . a high energy fall . . . will have arthritic changes in her knee and elbow . . . more probably than not . . . absolutely . . . no arthritic changes in right knee or right elbow . . . arthritic changes or condition in left knee and elbow . . . specifically related to the fall of March 12, 1992."
The forty-five page transcript of Dr. Reznik's testimony is incorporated herein by reference as his testimony provides the predicate for the jury's findings on fair, just and reasonable damages. He found a forty percent loss based on the articular CT Page 8807 cartilage damage and the loss of range of motion and combination for the left knee — and for the elbow, a thirty percent loss of elbow function.
There is no evidence of partiality, prejudice, mistake or corruption.
The damages awarded by the jury on the evidence before it as to which there is, no doubt, room for reasonable difference of opinion among fair minded men resulted from the function of the jury and not the court. Barbieri, above.
The Motion for Remittitur is denied (#124).
Objection to Motion for Remittitur is sustained (#130).
Supplemental Objection to the Defendant's Motion for Remittitur is sustained (7/14/95).
So ordered.
John N. Reynolds State Trial Referee